**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **ROSS ALLEN HARTWELL** | § | |
| **TDCJ No. 01893452** | § | |
| **Petitioner,** | § | |
| | § | |
| **v.** | § | **A-19-CV-659-LY** |
| | § | |
| **LORIE DAVIS, Director,** | § | |
| **Texas Department of Criminal Justice,** | § | |
| **Correctional Institutions Division,** | § | |
| | § | |
| **Respondent.** | § | |

**REPORT AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

TO:   THE HONORABLE LEE YEAKEL
      UNITED STATES DISTRICT JUDGE

The Magistrate Judge submits this Report and Recommendation to the District Court pursuant to 28 U.S.C. § 636(b) and Rule 1(e) of Appendix C of the Local Court Rules of the United States District Court for the Western District of Texas, Local Rules for the Assignment of Duties to United States Magistrates Judges.

Before the Court are *pro se* Petitioner's Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (ECF No. 1), Respondent Davis's Response (ECF No. 15), and Petitioner's Reply and Supplement (ECF Nos. 17-18). Having reviewed the record and pleadings submitted by both parties, the undersigned concludes Petitioner's federal habeas corpus petition should be denied under the standards prescribed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *See* 28 U.S.C. § 2254(d).

1

## I. Background

In March 2013, Petitioner was charged by indictment with one count of aggravated robbery and one count of unauthorized use of a motor vehicle. The indictment included three enhancement paragraphs for Petitioner's 2008 conviction for unauthorized use of a motor vehicle, his 2006 conviction for theft, and his 1997 convictions for robbery and burglary of a habitation. (ECF No. 14-94 at 5-8.) In October 2013, a jury convicted Petitioner of aggravated robbery with a deadly weapon, found the first and second enhancement paragraphs true, and sentenced Petitioner to seventy years in prison. *State v. Hartwell*, No. D-1-DC-13-904031 (390th Dist. Ct., Travis Cnty., Tex. Oct. 14, 2013) (*Id.* at 9-10.) Below is a summary of the factual background for Petitioner's conviction.

> Christina Morman, the complainant, testified at trial that on March 26, 2012, she was working the night shift at a Popeye's restaurant in Austin, Texas. She finished her shift at 11 p.m. and was in the process of leaving the Popeye's premises when she realized that she forgot her cigarette lighter. She parked her van near the front entrance of the restaurant, left her engine running, and went back inside to get her lighter. Upon returning to her vehicle she saw a person in the front passenger seat of her van. Morman ran to her van, put her hand on the door, and said "[h]ey, this is my car." The driver then reversed out of the parking space in such a way that the front end of the vehicle struck Morman and knocked her to the ground. The driver paused for a few seconds before running Morman over. Morman was dragged underneath the vehicle for approximately 246 feet before being dislodged. Co-worker Alexis Blount witnessed the event and corroborated Morman's testimony at trial.
>
> Co-defendant Joshua Voigt testified that he was with Hartwell when they stole Morman's vehicle: Voigt was in the passenger seat, and Hartwell was in the driver's seat. Voigt saw Morman run to the van and testified that she tried to open the rear passenger sliding door. He heard her "cuss", "yell at [them] to stop", and say, "[h]ey, this is my car." When Hartwell reversed the vehicle and knocked Morman to the ground, Voigt saw Morman lying on the ground in front of the vehicle. When Hartwell put the vehicle in drive and ran over Morman, Voigt testified that he heard a thump and felt the wheels go over Morman's body. He also testified that he could hear Morman screaming.

Detective Steve Boline with the Austin Police Department interviewed Hartwell that same day. The trial court admitted a redacted video of the custodial interview into evidence. The recording showed that Hartwell initially denied any involvement but later admitted to stealing Morman's vehicle. Hartwell admitted that he was the driver and that he put the van in reverse and backed out of the parking space. Hartwell claimed he decided to abandon the robbery upon seeing Morman running towards him after he reversed out of the parking space. He claimed Voigt reached over and grabbed the door, preventing him from exiting the vehicle. Hartwell also claimed that he was pressing on the brake, but Voigt reached down and depressed the gas pedal with his hand. Hartwell admitted during the interview that he saw someone in front of the vehicle but denied knowledge that he ran over anyone.

The jury found Hartwell guilty of aggravated robbery with an affirmative deadly weapon finding. Hartwell elected to have the jury decide punishment and entered a plea of "not true" to the enhancement allegations put forth by the State. The jury found two enhancement paragraphs to be true and assessed a term of seventy years' imprisonment, and the trial court sentenced Hartwell accordingly.

*Hartwell v. State*, No. 13-14-00087-CR, 476 S.W.3d 523 (Tex. App.—Corpus Christi-Edinburg July 2, 2015, pet. ref'd).

On July 2, 2015, Petitioner's direct appeal was affirmed in part, and reversed and remanded in part for a new trial on his punishment by the Thirteenth Court of Appeals of Texas. *Id*. Petitioner thereafter filed a Motion for Rehearing, which was denied (ECF Nos. 14-35, 14-37), and a Petition for Discretionary Review (PDR), which the Texas Court of Criminal Appeals (TCCA) refused on December 9, 2015 (ECF Nos. 14-80, 14-38), *Hartwell v. State*, No. PD-0955-15 (Tex. Crim. App. Dec. 9, 2015).

On remand, Petitioner's sentence was reduced to sixty years imprisonment. (ECF No. 14-94 at 12.) He appealed, and the sentence was affirmed on May 31, 2018. *Hartwell v. State*, No. 13-17-00037-CR, 2018 WL 2440515 (Tex. App.—Corpus Christi-Edinburg May 31, 2018). Petitioner did not file a writ of certiorari in the United States Supreme Court. (ECF No. 1 at 3.)

On July 30, 2018, Petitioner filed his state habeas corpus application, listing the following five grounds for relief:

1.  Trial counsel provided ineffective assistance when counsel failed to challenge or strike an unfair and impartial venire member;

2.  Trial counsel provided ineffective assistance when counsel failed to impeach Petitioner's co-defendant's false testimony;

3.  Trial counsel provided ineffective assistance when counsel failed to object to the State's improper closing argument;

4.  Petitioner was denied due process when the prosecutor failed to disclose the State's plea deal in exchange for the co-defendant's testimony against him; and

5.  Trial counsel's cumulative errors resulted in a denial of due process.

(ECF No. 14-94 at 16-33.) On November 14, 2018, the TCCA remanded Petitioner's application for an evidentiary hearing. (ECF No. 14-93 at 3-5.) On February 11, 2019, the trial court issued its findings of fact and conclusions of law and recommended denying all of Petitioner's grounds for relief. (ECF No. 14-93 at 21-30.) On March 27, 2019, the TCCA denied Petitioner's state habeas corpus application without written order on the findings of the trial court. *Ex parte Hartwell*, No. WR-88,980-01. (ECF No. 14-85.)

Petitioner filed the instant federal habeas petition on June 24, 2019. In it, he raises the same claims that were raised and rejected in his state writ application. (ECF No. 1.) On September 15, 2019, Respondent filed an answer, to which Petitioner replied on September 20, 2019 along with a supplement filed on December 30, 2019. (ECF Nos. 15, 17-18.)

## II. Standard of Review

Petitioner's federal habeas petition is governed by the heightened standard of review provided by AEDPA. *See* 28 U.S.C. § 2254. Under § 2254(d), a petitioner may not obtain federal habeas corpus relief on any claim that was adjudicated on the merits in state court proceedings unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the

4

Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Brown v. Payton*, 544 U.S. 133, 141 (2005). This demanding standard stops just short of imposing a complete bar on federal court re-litigation of claims already rejected in state proceedings. *Harrington v. Richter*, 562 U.S. 86, 102 (2011) (citing *Felker v. Turpin*, 518 U.S. 651, 664 (1996)).

A federal habeas court's inquiry into unreasonableness should always be objective rather than subjective, with a focus on whether the state court's application of clearly established federal law was "objectively unreasonable" and not whether it was incorrect or erroneous. *McDaniel v. Brown*, 558 U.S. 120 (2010); *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003). Even a strong case for relief does not mean the state court's contrary conclusion was unreasonable. *Richter*, 562 U.S. at 102. A petitioner must show that the state court's decision was objectively unreasonable, which is a "substantially higher threshold." *Schriro v. Landrigan,* 550 U.S. 465, 473 (2007); *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter*, 562 U.S. at 101 (citation omitted). As a result, to obtain federal habeas relief on a claim previously adjudicated on the merits in state court, Petitioner must show that the state court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103; *see also Bobby v. Dixon*, 565 U.S. 23, 24 (2011).

### III. Analysis

### A.  Ineffective Assistance of Trial Counsel (IATC) (claims 1-3, 5)

Four of Petitioner's five grounds for federal habeas relief involve claims that his trial counsel provided constitutionally deficient assistance of counsel. Specifically, Petitioner contends

trial counsel failed to: (1) challenge or strike a venire person who was unfair and impartial; (2) impeach Petitioner's co-defendant's false testimony; (3) object to the prosecutor's improper closing argument; and (4) provide effective assistance of counsel based on counsel's cumulative errors. As discussed below, Petitioner fails to demonstrate the state court's rejection of these challenges was contrary to, or an unreasonable application of, Supreme Court precedent.

### 1. The Strickland Standard

Sixth Amendment claims concerning the alleged ineffective assistance of trial counsel are reviewed under the familiar two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a petitioner cannot establish a violation of his Sixth Amendment right to counsel unless he demonstrates (1) counsel's performance was deficient and (2) this deficiency prejudiced his defense. *Id.* at 687-88, 690. The Supreme Court has emphasized that "[s]urmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).

When determining whether counsel performed deficiently, courts "must be highly deferential" to counsel's conduct, and a petitioner must show that counsel's performance fell beyond the bounds of prevailing objective professional standards. *Strickland,* 466 U.S. at 687-89. Counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Burt v. Titlow*, 571 U.S. 12, 22 (2013) (quoting *Strickland*, 466 U.S. at 690). To demonstrate prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Under this prong, the "likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112. A habeas petitioner has the burden of proving both prongs of the *Strickland* test. *Wong v. Belmontes*, 558 U.S. 15, 27 (2009).

IATC claims are considered mixed questions of law and fact and are analyzed under the "unreasonable application" standard of 28 U.S.C. § 2254(d)(1). *See Gregory v. Thaler*, 601 F.3d 347, 351 (5th Cir. 2010). Where, as here, the state court adjudicated the IATC claims on the merits, a federal court must review a petitioner's claims under the "doubly deferential" standards of both *Strickland* and Section 2254(d). *See Woods v. Etherton*, 136 S. Ct. 1149, 1151 (2016) (citing *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011)); *Knowles v. Mirzayance*, 556 U.S. 111, 112 (2009). In such cases, the "pivotal question" is not "whether defense counsel's performance fell below *Strickland*'s standards," but whether "the state court's application of the *Strickland* standard was unreasonable." *Richter*, 562 U.S at 101. Consequently, the question is not whether counsel's actions were reasonable, but whether "there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id*. at 105.

### 2. Failure to Strike a Juror

In claim 1, Petitioner argues his trial counsel, Alexandra Gauthier, was ineffective when she failed to challenge for cause or use a peremptory strike against venireperson #2, Alberto Rodriquez, whose response to counsel's questioning indicated he would be biased and unfair during trial. Petitioner points to a series of questions Ms. Gauthier asked the venire panel about their reactions to photographs of serious injuries:

> Ms. Gauthier: Is there anybody here who—so we may in the course of what's going on, there may be some serious photographs of some injuries or other evidence that might be considered graphic and disturbing. Is there anybody here who, like when I see the sight of my own blood, that could be a problem for them?

> Ms. Gauthier: Is there anybody who feels that their passion or their fear of that type of serious evidence would keep them from being able to concentrate and look at all the evidence for what it is and not be swayed by their person and their passion?

(ECF No. 14-12 at 145, 147.) In response to the second question, Mr. Rodriguez, responded, "I

could be overwhelmed by my emotions depending on what I'm hearing or what I'm seeing so I think it can cloud it and prevent me from being objective in terms of what is being presented to me." Ms. Gauthier then asked, "So if there were pictures of injuries or blood [then] that would be something that would keep you from being able to be a fair and impartial juror?" Mr. Rodriguez responded, "Yes, within the short term where also in the long term it can be distracting when you are starting to lose critical information from either what the prosecutor or the defense is trying to." Mr. Rodriguez and Ms. Gauthier then had the following exchange:

> Mr. Rodriguez: Mainly what I'm saying is the information they will be presenting to us whether it's graphic images or verbal, I can get easily overwhelmed by things like that, so then it prevents me from being objective in terms of what they are trying to present to me and so it can cloud my judgment and maybe distract me.

> MS. GAUTHIER: Paying attention 100 percent and giving your fair and open-mindedness to being open to other things other than physical evidence like the eyewitness identification or anything else that's going on, you feel that that would overwhelm you and you would be unable to be fair?

> MR. RODRIGUEZ: Yes.

(*Id.* at 145-49.) Ms. Gauthier then asked the venire panel if anyone else felt the same as Mr. Rodriguez, and seven jurors raised their hands. All seven of those jurors were called back for further questioning, with six thereafter dismissed for cause, and one dismissed via peremptory strike. However, Ms. Gauthier never called back Mr. Rodriguez to question him further   about his statement that he would be unable to be fair after looking at graphic photographs. He was empaneled on the jury that found Petitioner guilty. (ECF Nos. 14-4,14-12 at 169-93.)

Ms. Gauthier filed an affidavit with the state habeas court responding to Petitioner's allegations. With regard to her failure to challenge or strike Mr. Rodriguez, she attested as follows.

> Usually if there are photographs with blood involved, I use it as a way to ask questions to gauge the temperature of the jury, and a vehicle for deciding how to use peremptory strikes. While looking at the panel on paper may assist, in person I

8

am gauging not only their words, but also endeavoring to have a conversation with them to develop an opinion of their temperament, body language, how they respond to their peers, how passive or aggressive, if I think they're going to be a leader or a follower.

Additionally, I find this line of questioning useful to desensitize jurors and prepare them for viewing graphic photographs—the idea is that if you can introduce potential jurors to the idea of viewing graphic photos, they tend to imagine the worst scenario and when they see the actual photographs they aren't as shocked. I would call people to the bench for further questioning only if I felt that there was something that they said or conveyed through body language that would have made me want to have them struck. While I don't recall the specific juror, my sense is that had he been someone who came across as a problem for our defense, or as overly aggressive, such as those who agreed quickly and adamantly with the initially vague and soft spoken words and feelings expressed by #2 about the pictures, I would have challenged him for cause by calling him up to the bench or exercised a peremptory strike.

I do remember and as he mentions in his writ, and it was my practice, to give [Petitioner] pen and paper to help participate in the jury selection and at trial, as an extra set of eyes and note taking. He fully participated in the discussion of peremptory strikes, he had taken his own notes on voir dire, and he signed the strike list in agreement with the list, which is reflected in the record. At no point did he raise a concern or bring to our attention any objections to juror number two. By [Petitioner]'s own recollections in the writ such as comments about co-counsel and myself, it would indicate that he was taking notes and was very aware of what [was] happening during jury selection and the trial as a whole.

In my opinion, any feelings that juror number 2 had about how he could react to photographs is a relatively minor issue [] considering the totality of the trial and that the injuries weren't a contested issue of fact. Also, to my recollection Mr. Rodriguez, or any of the venire, had no apparent negative reaction to actually viewing the photographs during the trial. (ECF No. 14-93 at 15-16.)

Upon review of Ms. Gauthier's affidavit, the state habeas court found the following:

12. The prospective juror stated in response to the voir dire questioning, "I could be overwhelmed by my emotions depending on what I'm hearing or what I'm seeing so I think it can cloud it and prevent me from being objective in terms of what is being presented to me ... [question omitted] ... Yes, within the short term where also in the long term it can be distracting when you are starting to lose critical information from either the prosecution or the defense is trying to."

16. The response from the prospective juror was not a demonstration of bias or prejudice such that he would have been subject to a challenge for cause pursuant to Article 35.16 of the Texas Code of Criminal Procedure.[1]

18. Even if the record demonstrates some lack of impartiality by a prospective juror, the Applicant must overcome the strong presumption that his counsel's decision not to challenge the juror fell outside the wide range of reasonable professional assistance. *Spencer v. State,* 1995 Tex. App. LEXIS 770 (Tex. App.-Houston Apr. 6, 1995).

21. The Applicant fully participated with his attorney in the discussion of peremptory strikes and signed the defense's strike list before it was submitted to the trial court.

22. Ms. Gauthier was acting within the range of reasonable professional assistance in her questioning of the jury and in the exercise of strikes.

(*Id.* at 23-24.) The trial court concluded that counsel's performance was not deficient and that Petitioner had not established prejudice from the alleged error. (*Id.* at 24.) The TCCA denied relief on the findings of the trial court. (ECF No. 14-85.)

The issue of juror bias is a factual finding. *Virgil v. Dretke*, 446 F.3d 598, 610 n.52 (5th Cir. 2006) (citing *Patton v. Yount,* 467 U.S. 1025 (1984)). Under the AEDPA, this court can only overturn the implicit factual findings of the state court if Petitioner rebuts the presumption of correctness "by clear and convincing standards." 28 U.S.C. § 2254(e)(1). Here, the state habeas court's factual findings omitted the parts of Mr. Rodriguez's voir dire statements where he answers "yes" to Ms. Gauthier's question if seeing graphic photographs would prevent him from being a fair and impartial juror. Further, although the state habeas court notes that Petitioner signed trial counsel's list of peremptory strikes, it made no findings regarding the fact that all the other jurors

---

[1] Article 35.16 states "A challenge for cause is an objection made to a particular juror, alleging some fact which renders the juror incapable or unfit to serve on the jury. A challenge for cause may be made by either the state or the defense for any one of the following reasons: (9) That the juror has a bias or prejudice in favor of or against the defendant." The statute forbids jurors subject to challenges based on either their conviction or indictment for a misdemeanor or felony, or if they are insane, to be seated on jury but states that "[a]ll other grounds for challenge may be waived by the party or parties in whose favor such grounds of challenge exist." TEX. CODE CRIM. PROC. 35.16.

who answered in the same manner as Mr. Rodriguez were called back for further questioning, and with the exception of a juror who was rehabilitated, were all dismissed for cause.

Despite these issues, the Court need not decide whether Petitioner has rebutted the state habeas court's findings by clear and convincing evidence. To succeed on his IATC claim, Petitioner must also show that counsel's allegedly deficient performance prejudiced his defense such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Further, the "likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112. *See also Pondexter v. Quarterman*, 537 F.3d 511, 520 (5th Cir. 2008) (finding that an IATC claim may be rejected for want of either deficient performance or prejudice, and thus the absence of either prong of the *Strickland* analysis is dispositive) (citation omitted).

Petitioner has failed to show that, but for Mr. Rodriguez sitting on the jury, there is a substantial likelihood he would not have been found guilty of aggravated robbery. In a handwritten confession, Petitioner admitted to taking Ms. Morman's car without permission and stated "I've been made aware of a person getting injured during this offense and I . . . take full responsibility for this terrible act." (ECF No. 14-25 at 73.) As a result of Petitioner's confession, the trial was focused almost solely on whether Petitioner was aware that he hit Ms. Morman when reversing and drove off with her underneath the vehicle.

Ms. Morman testified at trial that as she was returning to her car after retrieving her lighter, she saw "legs on the passenger side, but by the time I got to the door to open the door, the legs had gotten into the car, and I approached the car and I put my hand on the passenger door, and I said, 'Hey, this is my car,' and the car went into reverse and I was knocked on the ground then the car

11

started to roll towards me. I blacked out from there." (ECF No. 14-14 at 72.) She also testified that the vehicle's headlights were on. (*Id.*)

Alexis Blount, Ms. Morman's coworker at Popeye's, testified that she saw Ms. Morman's car, that the headlights were on, that it appeared to her Ms. Morman's arms were inside the passenger-side window of the car when it started reversing, and that Ms. Morman was caught beneath the car when it started to drive off. (*Id.* at 132-33.) Joshua Voigt, Petitioner's co-defendant, testified that he and Petitioner entered Ms. Morman's car—Petitioner in the driver's seat, Voigt in the passenger side—and that Voigt ended up jumping out of the car when Petitioner ran over Ms. Morman. (*Id.* at 189-90.) He further testified that when Petitioner backed up the car, Ms. Morman fell over: "she was holding onto the door, the sliding door shut, she fell and hit the ground, hit the car, hit the ground, and now he's back up and she's in front of the vehicle at this time." And then Voigt felt Petitioner run over Ms. Morman on the passenger side of the car. He also testified that he heard screams from Ms. Morman. (*Id.* at 241-42.) Jeffrey Eads, a detective in the vehicular homicide division of the Austin Police Department, testified that anyone driving the car would have been felt the vibration of running over an object like a human being. (ECF No.14-15 at 198-99.)

The crux of Petitioner's trial was whether or not he knew Ms. Morman was near the car when he reversed, and then under the car when he drove off. The jury deliberated for little more than an hour and a half before returning a guilty verdict. The Court concludes there was ample evidence supporting the Petitioner's conviction and that the photographs showing Ms. Morman's injuries were not material to the question of whether Petitioner knew Ms. Morman was near and/or under the car. Accordingly, the Court concludes the state court's application of *Strickland* was not unreasonable and recommends denying this ground for relief.

### 3. Failure to Impeach False Testimony

In claim 2, Petitioner argues trial counsel provided ineffective assistance when she failed to impeach his co-defendant, Joshua Voigt's, allegedly perjurious testimony. Specifically, Petitioner argues that counsel should have impeached Voigt's testimony that Ms. Morman's van had sliding doors when pictures of the van showed it did not have sliding doors. Petitioner argues that, had counsel impeached Voigt with this error, his entire testimony would have been discredited. As it stands, his testimony was not impeached and the jury could have believed his story about what happened, thus leading the jury to conclude that Petitioner knew Ms. Morman was next to/under the car when he drove off.

In her affidavit, counsel responded as follows:[2]

> I do not believe that this claim that I did not impeach Mr. Voigt has merit. The record reflects that I spent a long time cross examining the co-defendant undermining his credibility and pointing out his motivation to give testimony that made him seem less culpable and hopefully get a better deal from the State to explain why he would testify [Petitioner] knew that Ms. Morman was present and pulled under by the car. . . .

> The issue of the passenger "side door being open vs. the sliding door being open" and grabbed on to is not the lynch pin to [Petitioner]'s case. My cross examination elicited testimony consistent with my strategy and trial theme that [Petitioner] did not know that Ms. Morman was present. There was no plan to steal a car, they just saw the car running and both ran up to the car and jumped in. Mr. Voigt testified under cross examination that he could not remember what she looked like, only that she was female, short, small and didn't know what race she was. It happened in seconds. If Ms. Morman made contact with anyone that dark night, it was the passenger only (Mr. Voigt) and it was on the passenger side of the vehicle. Mr. Voigt testified that it was very dark, "it happened so fast." "She came to my side, then back and tried to open the door then fell." He did not know where she was hit, he couldn't see her after she fell to the ground, "she was holding on to the door."

(ECF No. 14-93 at 17-18.) Upon review of the record and affidavits, the state habeas court found:

---

[2] The Court has corrected the spelling of Joshua Voigt's name when misspelled in the affidavits before the state habeas court as well as the court's findings of fact and conclusions of law. Counsel's record citations have also been omitted.

31. Ms. Gauthier's overarching trial theme was that the Applicant did not know that the victim was present at the time.

32. Ms. Gauthier's cross-examination of the co-defendant was extensive.

33. The record of the cross-examination of the co-defendant reflects that Ms. Gauthier thoroughly reviewed the co-defendant's prior statements and agreement for use immunity, and questioned him in detail about his statements and possible motive to testify.

34. The Applicant has failed to prove that his trial counsel's cross-examination and impeachment of Joshua Voigt fell below an objective standard of reasonableness.

35. A party fails to carry his burden to prove ineffective assistance of counsel where the probability of a different result absent the alleged deficient conduct sufficient to undermine confidence in the outcome is not established. *See Washington v. State,* 771 S.W.2d 537, 545 (Tex. Crim. App. 1989).

36. The impeachment or correction of the allegedly false testimony about the type of door on the vehicle would not have impacted the overarching defensive theme or likely resulted in a different outcome.

(*Id.* at 25.)

To succeed on his IATC claim, Petitioner must show that there is a substantial likelihood that, but for counsel's failure to impeach Voigt's allegedly false testimony about the van having sliding doors, Petitioner would not have been convicted of aggravated robbery. As noted in the prior section, there was ample evidence introduced at trial showing Petitioner was aware of Ms. Morman's proximity to the car and that he had driven over her. Petitioner has failed to show it is substantially likely that impeaching Voigt's testimony on this issue would have resulted in a different verdict. Accordingly, the Court concludes that the state court's application of *Strickland* was not unreasonable and this claim should be denied.

### 4. Failure to Object to the State's Closing Argument

Petitioner next argues his counsel was ineffective when she failed to object to the prosecutor's improper closing argument. Petitioner takes issue with a section of the prosecutor's

closing argument where she responds to the defense's theory that Petitioner did not know Ms.

Morman was near the car when he reversed and drove off:

> Let's ask him. "I got into the driver's side of the van with him. I put it in reverse, backed out, and some people came running. I don't know who or how many, and when I saw people running. And it's right there and I thought, what am I doing?"
>
> "When I saw people running." It doesn't matter if it's Alexis Blount or Christina Morman. This is the example we talked about in voir dire, the little old lady with the purse. I come up to steal it from her and she fights me and I go to swing her around. I don't have to prove to you that he woke up wanting to hurt anybody. I don't have to prove to you that he meant to hurt anybody. I don't have to prove to you that he intended to hurt anybody. Simply if there was a substantial and unjustifiable risk that it could happen. That's reckless. . . .
>
> Let's take it up a notch. That car is stolen. Let's take it up a notch. There are keys in it and it's running. You know somebody is coming back. They are not going to leave their car there until the battery runs down, I think I'll go find another car. No, they are coming back. Then he puts it in reverse and he does it quickly. At some school in the south there is a bumper sticker that says "Drive It Like You Stole It," because you don't drive a stolen car slowly.

(ECF No. 14-16 at 81-82.) Petitioner argues that by failing to object to this part of the State's

closing argument, Ms. Gauthier allowed the jury to hear a misstatement of the law (i.e. that

Petitioner did not need to be aware of the victim to support a an aggravated robbery conviction),

which constituted ineffective assistance of counsel.

In her state habeas affidavit, Ms. Gauthier responded as follows:

> I do not recollect the decision not to object to the particular statement with the passage of time, but I can opine why I did not object to it. While there may have been a misstatement of the law, as worded, it was one moment in a long flow of summary of the evidence. Had I objected, that would have pointed out what the State was trying to convey and underline it. The evidence of [Petitioner]'s mens rea was before the jury to apply to the law as charged, which was argued by me. If I had made that objection, and it was sustained, the judge would have, in all likeliness, instructed the jury to disregard what the State had said and direct them to the jury charge as the law they were ordered to consider. To further preserve error, I would have to ask for a limiting instruction and then a mistrial, which I feel would have undermined my credibility during my closing argument as just opinion as well. While it may have been preserving error to object to the argument, it would

have been shining a light on bad facts once again and the sooner the State would stop reliving the facts in the light most favorable to them, the better. This was a strategic decision on my part.

(ECF No. 14-93 at 19.) The state habeas made the following findings:

43. Where counsel makes a strategic decision not to object to improper argument because she does not wish to draw the jury's attention to the argument, the attorney may be acting within the bounds of reasonable professional assistance. *Ex parte Scott,* 541 S.W.2d 104, 120 (Tex. Crim. App. 2017).

44.·Ms. Gauthier's affidavit is credible and supported by the record.

46. Ms. Gauthier did not object to the alleged improper argument by the State because she did not wish to draw the jury's attention to the argument.

47. The Applicant has failed to prove that his trial counsel's strategic decision to abstain from objecting to alleged improper argument by the State fell below an objective standard of reasonableness.

49. The Applicant has failed to show a reasonable probability that, but for the alleged acts of misconduct, the result of the proceeding would have been different.

(*Id.* at 27.)

Trial counsel have broad discretion when it comes to deciding how best to proceed strategically. *See Ward v. Stephens*, 777 F.3d 250, 264 (5th Cir. 2015) (the Supreme Court has emphasized counsel has "wide latitude in deciding how best to represent a client"); *Clark v. Thaler*, 673 F.3d 410, 427 (5th Cir. 2012) (recognizing the broad deference to which counsel is entitled in making tactical decisions in closing argument) (citation omitted). Decisions to object or not object during closing argument are matters of trial strategy that are presumed reasonable under *Strickland. Wiley v. Puckett*, 969 F.2d 86, 102 (5th Cir. 1992).

In Ms. Gauthier's affidavit, she attests she refrained from objecting to the prosecutor's alleged misstatement of the law so as not to draw attention to those facts. The state habeas court found that Petitioner failed to show (1) counsel's decision was outside the boundaries of reasonable

professional assistance and (2) a substantial likelihood that, but for Ms. Gauthier's decision, the outcome of his trial would have been different. This Court concludes the habeas court's findings are not an unreasonable application of *Strickland*, and recommends this claim be denied.

### 5. Cumulative Error

Petitioner's last IATC claim argues that trial counsel provided ineffective assistance based on the cumulative effect of all the errors previously discussed. However, as the Court has concluded that none of Petitioner's IATC claims are meritorious, there can be no cumulative effect. *See Westley v. Johnson*, 83 F.3d 714, 726 (5th Cir. 1995) ("Meritless claims or claims that are not prejudicial cannot be cumulated, regardless of the total number raised." (citing *Derden v. McNeel,* 978 F.2d 1453, 1461 (5th Cir.1992))). Accordingly, under the deferential review encompassed by *Strickland* and the AEDPA, this claim should be denied. *Richter*, 562 U.S at 105.

## B.  Failure to Disclose Plea Deal (claim 4)

In his last ground for relief, Petitioner argues that he was denied due process when the prosecutors failed to disclose a plea deal they struck with his co-defendant in exchange for Voigt's testimony against Petitioner. In support of his allegation, Petitioner points to the following exchange between Voigt and his personal attorney, Mr. Larry Dowling, which occurred on the record but outside the jury's hearing:

Dowling: Do you recall you and I discussing your testifying for the State?

Voigt: No, sir, no.

Dowling: Well, we've discussed --

Voigt: We've discussed some stuff, yes.

Dowling: Yes. And that I advised you that I thought if the State proved their case against you that a jury would light you up.

> Voigt: Yes, sir.
>
> Dowling: And did I also tell you that your best out would be to testify for the State?
>
> Voigt: Yes, sir.
>
> Dowling: That you decide to accept that advice?
>
> Voigt: Yes, sir.

(ECF No. 14-14 at 178.) Six days after Petitioner was convicted of aggravated robbery, Voigt pleaded guilty to Unauthorized Use of a Motor Vehicle (enhanced) and was sentenced to ten years imprisonment. (ECF No. 14-96 at 51.) Petitioner argues that prosecutors made a deal with Voigt in exchange for his testimony, and withheld this evidence from the defense.

The lead prosecutor, Katie Sweeten, filed an affidavit before the state habeas court, denying any plea deal prior to Voigt's testimony. Ms. Sweeten attested as follows:

> I was the lead prosecutor in *State v. Ross Hartwell* from the time of his reindictment through the trial proceedings and post-trial proceedings. I, along with my co-counsel Steve Brand, personally interviewed, the indicted co-defendant of [Petitioner], Joshua Voigt. I prepared the letter memorializing our agreement for use immunity, in addition to other tasks related to preparing the instant case for trial. If there had been another agreement with Mr. Voight that could in any way be construed as a promise of a benefit in exchange for his testimony, I would have recognized the obligation to disclose that to [Petitioner] through his counsel, and I would have taken the steps to ensure disclosure was performed. . . .
>
> [Petitioner]'s claim in his application for habeas relief that a deal was struck between the State and Mr. Voigt is contrary to what actually occurred. The only agreement between the State and Mr. Voigt, who was represented by his own counsel, prior to his testimony was a use immunity agreement. That agreement was disclosed both orally and in writing to [Petitioner]'s attorney in advance of his trial. I emphatically deny [Petitioner]'s accusation that the State withheld any exculpatory information from him, because we disclosed the only agreement that existed between the State and Mr. Voigt, and his speculative accusation that there must have been more is completely without merit. The ten-year plea bargain offer was not made to Mr. Voigt's attorney until after [Petitioner] had been tried and sentenced.

(ECF No. 14-93 at 10-11.) The state habeas court made the following findings:

54. Ms. Sweeten's affidavit is credible and supported by the record.

57. At the time of his testimony against the Applicant, Mr. Voigt had entered into a use immunity agreement with the State in exchange for his testimony at the Applicant's trial.

58. The use immunity agreement was material, and was timely disclosed to the Applicant and was used to impeach Mr. Voigt.

59. Shortly after the Applicant's first trial, Mr. Voight pled to unauthorized use of a motor vehicle (enhanced) and received a ten-year sentence pursuant to a plea bargain with the State.

60. Mr. Voigt testified at both Applicant's guilt-innocence trial, and his subsequent punishment trial before the court, that no plea bargain deal had been reached between him and the State before he testified at the guilt-innocence trial.

61. No credible evidence shows the existence of another agreement or understanding between Mr. Voigt and the State.

62. The Applicant's belief that a favorable agreement or understanding existed between Mr. Voight and the State is speculative.

(*Id.* at 28.)

"[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland,* 373 U.S. 83, 87 (1963). In order to establish a *Brady* violation, a petitioner must demonstrate that (1) the prosecution suppressed evidence, (2) the evidence was favorable to the defense, and (3) the evidence was material to either guilt or punishment. *Banks v. Dretke*, 540 U.S. 668, 691 (2004); *Graves v. Cockrell*, 351 F.3d 143, 153-54 (5th Cir. 2003).

Under Rule 2(c) of the Rules Governing Section 2254 Cases, a petitioner is required to plead facts in support of his claims. "'Absent evidence in the record,'" the undersigned will not "'consider a habeas petitioner's bald assertions on a critical issue in his *pro se* petition . . . , unsupported and unsupportable by anything else contained in the record, to be of probative

evidentiary value.'" *Ford v. Davis*, 910 F.3d 232, 235 (5th Cir. 2018) (quoting *Ross v. Estelle*, 694 F.2d 1008, 1011 (5th Cir. 1983)).

Petitioner has no evidence outside his own allegations that supports his claim prosecutors failed to disclose a plea bargain with Mr. Voigt. Because Petitioner's *Brady* claim is only supported by conclusory allegations, it should be denied. *See Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000) (a petitioner is not entitled to relief on the basis of conclusory allegations).

## IV. Recommendation

The undersigned recommends that the District Court **DENY** Petitioner's petition for a writ of habeas corpus.

## V. Certificate of Appealability

A petitioner may not appeal a final order in a habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1)(A). Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases, the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. *See Miller-El v. Cockrell,* 537 U.S. 322, 335-36 (2003) (citing 28 U.S.C. § 2253(c)(1)).

A certificate of appealability may issue only if a petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). In cases where a district court rejects a petitioner's constitutional claims on the merits, "the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). When a district court rejects a habeas petition on procedural grounds without reaching the constitutional claims, "a COA should issue when the petitioner shows, at least, that jurists of reason would find it debatable whether the petition states

a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

In this case, reasonable jurists could not debate the dismissal or denial of the Petitioner's § 2254 petition on substantive or procedural grounds, nor find that the issues presented are adequate to deserve encouragement to proceed. *Miller-El*, 537 U.S. at 327 (citing *Slack*, 529 U.S. at 484). Accordingly, the undersigned recommends that the Court should not issue a certificate of appealability.

## VI. Objections

Within 14 days after receipt of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge. 28 U.S.C. § 636 (b)(1)(C). Failure to file written objections to the proposed findings and recommendations contained within this report within 14 days after service shall bar an aggrieved party from de novo review by the district court of the proposed findings and recommendations and from appellate review of factual findings accepted or adopted by the district court except on grounds of plain error or manifest injustice. *Thomas v. Arn*, 474 U.S. 140, 148 (1985); *Douglass v. United Servs. Auto. Assoc.*, 79 F.3d 1415 (5th Cir. 1996) (*en banc*); *Rodriguez v. Bowen*, 857 F.2d 275, 276-77 (5th Cir. 1988).

SIGNED this 13th day of August, 2020.

------------------------------------------------------
ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE